# 14-2919-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT



New York State Citizens' Coalition for Children,

*Plaintiff-Appellant,*

*v.*

Sheila J. Poole, Commissioner of the New York State Office of
Children & Family Services, in her official capacity,

*Defendant-Appellee.*

_____

*On Appeal from the United States District Court
for the Eastern District of New York (Brooklyn)*

## BRIEF FOR PLAINTIFF-APPELLANT
## NEW YORK STATE CITIZENS' COALITION FOR CHILDREN

Brian R. Matsui
Morrison & Foerster LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
202-887-1500

Grant J. Esposito
Adam J. Hunt
Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
212-468-8000

*Attorneys for Plaintiff-Appellant New York State Citizens' Coalition For Children*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 the undersigned counsel for plaintiff-appellant the New York State Citizens' Coalition for Children (the "Children's Coalition"), states that the Children's Coalition is not publicly held, that it does not have any corporate parent that is publicly held, and that there are no publicly held entities that own more than 10% of the Coalition.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ I

TABLE OF CONTENTS ................................................................................... II

TABLE OF AUTHORITIES ............................................................................ IV

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ............................... 1

STATEMENT OF THE CASE ............................................................................. 1

    A.    There is a Private Right of Action for Foster Parents Under Sections 672 and 675(4)(A) of the Child Welfare Act ........................ 4

    B.    The Children's Coalition's Lawsuit ..................................................... 7

    C.    The District Court's Ruling ................................................................. 9

SUMMARY OF THE ARGUMENT .................................................................... 11

STANDARD OF REVIEW ............................................................................... 14

ARGUMENT ................................................................................................... 14

I.    THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT CONGRESS DID NOT INTEND FOR THE FOSTER CARE MAINTENANCE PROVISIONS TO BENEFIT PLAINTIFFS. ................ 16

    A.    The Foster Care Maintenance Provisions Contain Express "Rights Creating" Language. ............................................................ 16

    B.    The Foster Care Maintenance Provisions Have An Individualized Focus. ........................................................................ 22

    C.    There Is No Effective Federal Review Mechanism To Enforce Foster Parents' Rights Under The Foster Care Maintenance Provisions. ........................................................................................ 31

ii

II.   THE REMAINING *BLESSING* FACTORS DEMONSTRATE A PRIVATE RIGHT OF ACTION UNDER SECTIONS 672(A)(1) AND 675(4)(A). ............................................................32

      A.   Enforcement Of The Foster Care Maintenance Provisions Would Not Strain Judicial Competence. ............................................33

      B.   Section 672(a)(1) Is Couched In Mandatory Terms. ........................34

CONCLUSION ....................................................................................35

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*31 Foster Children v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ...........................................................................20

*Alabama v. Bozeman*,
533 U.S. 146 (2001).............................................................................................32

*ASW v. Oregon*,
424 F.3d 970 (9th Cir. 2005) .........................................................................19, 24

*Blessing v. Freestone*,
520 U.S. 329 (1997).......................................................................................passim

*C.H. v. Payne*,
683 F. Supp. 2d 865 (S.D. Ind. 2010)...................................................................15

*California Alliance of Child & Family Services v. Allenby*,
459 F. Supp. 2d 919 (N.D. Cal. 2006) ("*Allenby I*")...........................................32

*California Alliance of Child & Family Services v. Allenby*,
589 F.3d 1017 (9th Cir. 2009) ("*Allenby II*")................................................19, 32

*California State Foster Parent Association v. Wagner*,
624 F.3d 974 (9th Cir. 2010) .......................................................................passim

*Connor B. ex rel. Vigurs v. Patrick*,
771 F. Supp. 2d 142 (D. Mass. 2011).......................................................15, 17, 21

*Doe v. Kidd*,
501 F.3d 348 (4th Cir. 2007) ................................................................................17

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)..............................................................................................19

iv

*Gonzaga University v. Doe.*,
  536 U.S. 273 (2002)......................................................................................passim

*Grammer v. John J. Kane Regional Centers-Glen Hazel*,
  570 F.3d 520 (3d Cir. 2009) ...............................................................17

*In re Bernard L. Madoff Investment Securities LLC*,
  654 F.3d 229 (2d Cir. 2011) ...............................................................19

*Kenny A. ex rel. Winn v. Perdue*,
  218 F.R.D. 277 (N.D. Ga. 2003) ...........................................12, 15, 21, 32

*L.J. v. Wilbon*,
  633 F.3d 297 (4th Cir. 2011) ...............................................20, 24, 28

*Levine v. Apker*,
  455 F.3d 71 (2d Cir. 2006) ...............................................................33

*Lynch v. Dukakis*,
  719 F.2d 504 (1st Cir. 1983).............................................................20, 24

*Midwest Foster Care & Adoption Association v. Kincade*,
  712 F.3d 1190 (8th Cir. 2013) ...........................................10, 15, 18

*Midwest Foster Care & Adoption Association v. Kinkade*,
  No. 11-cv-01152-DW (W.D. Mo. Mar. 9, 2012) ...............................15

*Missouri Child Care Association v. Martin*,
  241 F. Supp. 2d 1032 (W.D. Mo. 2003) .........................................15

*NextG Networks of New York, Inc. v. City of New York*,
  513 F.3d 49 (2d Cir. 2008) ...............................................................14

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  132 S. Ct. 2065 (2012)......................................................................28

*Rio Grande Community Health Center, Inc. v. Rullan*,
  397 F.3d 56 (1st Cir. 2005)...............................................................16

*Romano v. Greenstein*,
  721 F.3d 373 (5th Cir. 2013) .............................................................17

v

*Sabree ex rel. Sabree v. Richman*,
    367 F.3d 180 (3d Cir. 2004) ...................................................................16

*Sam M. ex rel. Elliot v. Chafee*,
    800 F. Supp. 2d 363 (D.R.I. 2011) .................................................15, 29

*Selevan v. N.Y. Thruway Authority*,
    584 F.3d 82 (2d Cir. 2009) ...................................................................14

*Suter v. Artist M.*,
    503 U.S. 347 (1992).....................................................................passim

*Taylor v. Vermont Department of Education*,
    313 F.3d 768 (2d Cir. 2002) .................................................................29

*U.S. v. Torres-Echavarria*,
    129 F.3d 692 (2d Cir. 1997) .................................................................28

*Wilder v. Virginia Hospital Association*,
    496 U.S. 498 (1990)..................................................................23, 24

**STATUTES**

20 U.S.C. § 1232g(b)(1) .............................................................................25

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1343(a)(3)................................................................................1

42 U.S.C. §§ 670, *et seq.*...........................................................................1

42 U.S.C. §§ 671(a)-(b) .............................................................................5

42 U.S.C. § 672(a)(1)...........................................................................passim

42 U.S.C. §672(b) ............................................................................5, 9, 10

42 U.S.C. § 672(c) ......................................................................................5

42 U.S.C. §§ 675(1)(5)................................................................................4

42 U.S.C. § 675(4)(A)........................................................................passim

ny-1160331

42 U.S.C. § 1320a-2 ..................................................................7, 29

42 U.S.C. § 1396(c) ......................................................................24

42 U.S.C. § 1396r(b)(2)(A)............................................................17

42 U.S.C. § 1983 ....................................................................passim

**OTHER AUTHORITIES**

45 C.F.R. §§ 233.10, 1355.21, 1356.21 ..................................................5

Federal Rule of Civil Procedure 12(b)(1) ..................................................1

vii

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1343(a)(3). On July 17, 2014, the district court issued a final Decision and Order dismissing the Children's Coalition's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(1). The Children's Coalition filed a timely notice of appeal on August 14, 2014. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the district court erred in concluding—contrary to the majority of courts that have considered this issue—that foster parents, without whom foster children become wards of the State, do not have a privately enforceable right under 42 U.S.C. §§ 672(a)(1) and 675(4)(A) to receive support payments Congress requires to cover the most basic needs of each child in foster care.

## STATEMENT OF THE CASE

This is an action brought under 42 U.S.C. § 1983 to enforce certain rights Congress created under the Adoption Assistance and Child Welfare Act of 1980 ("CWA"), also known as Title IV-E of the Social Security Act and codified at 42 U.S.C. §§ 670, *et seq.* The CWA was enacted in the face of the States' severe mismanagement and underfunding of their foster care systems, which led to horrific abuse and neglect to individual children throughout the United States.

Recognizing that hoarding abandoned children into group homes run by States creates enormous costs, both qualitatively (compromising the safety and welfare of the weakest members of our society) and quantitatively (the money to pay for the basic necessities of food, shelter and clothing), the CWA was designed to encourage—and support—the selfless parents who agree to care for children others would not. Congress therefore mandated that participating States "shall make foster care maintenance payments" for "each child" foster parents take into their care. 42 U.S.C. §§ 672(a)(1), 675(4)(A).

There is no credible dispute that the payments made to foster parents in New York fall well short of meeting these statutory requirements. The question before the district court (the Honorable William F. Kuntz, II) was whether foster parents, who have opened their hearts and their doors to these kids, are precluded from bringing suit to demand their kids receive what Congress required. Unlike a majority of the courts to have ruled on this issue, the district court closed the courthouse doors, dismissed the action, and held that the asserted provisions of the CWA are not privately enforceable under Section 1983.

The district court should not have dismissed plaintiffs' complaint. Congress unambiguously intended these provisions to be privately enforceable under Section 1983. Congress did so by choosing individualized, rights-creating

2

language in enacting these provisions of the CWA. Sections 672 and 675 require that States "*shall* make foster care maintenance payments" for "*each* child" sufficient to cover the costs of basic necessities such as food, clothing, and shelter. *See* 42 U.S.C. §§ 672(a)(1), 675(4)(A) (emphasis added). And Congress confirmed its intent when it enacted the *Suter* fix—where Congress overruled broad judicial hostility to the recognition of enforceable federal rights under the CWA. Thus, under well-settled principles from this Court and the Supreme Court, the foster care maintenance payment provisions of the CWA create private federal rights that are enforceable under Section 1983.

The district court's refusal to recognize a private right of action has severe consequences for children and foster care parents throughout the State. The particular provisions of the CWA at issue here were designed to ensure that States reimburse foster parents for the costs of providing basic necessities to the children that these parents voluntarily take into their care. Plaintiffs filed this action to remedy exactly what Congress sought to prevent in enacting the CWA. But New York has failed to provide each child foster care maintenance payments that meet federal requirements. Even using conservative calculations, New York currently underpays foster parents by between 32% to 43% of what it actually costs to provide the goods and services that must be covered under the CWA's foster care

3

payment provisions. This is not insignificant: it means that foster parents in New York receive between $169 and $254 less per month than what they need to cover the cost of basic necessities. The cost of living in New York is one of the most expensive in the country, yet its foster care maintenance payment rates rank below those of States where the cost of living is significantly lower, such as Arizona, Tennessee, and Wyoming. In fact, New York currently pays less to foster parents to care for a child than a kennel charges to board and feed a dog.

The district court should be reversed.

## A. There is a Private Right of Action for Foster Parents Under Sections 672 and 675(4)(A) of the Child Welfare Act

The CWA was enacted to remedy a serious problem facing children throughout the nation. Children in foster care were "'getting lost' in State foster care systems." Cong. Rec. 8-2-79 H 7091. There were reports of abused and neglected children being placed in "temporary" foster care placements, only to spend most of their lives being shuffled from one home to another because there was not enough money to provide foster care parents with the resources to raise their children. Cong. Rec. 8-2-79 H 7097. Against this backdrop, Congress enacted the CWA to develop a comprehensive federal regime to reform the foster care system and address the need for providing funds to care for children in the system. 42 U.S.C. §§ 675(1)(5). The CWA created an opt-in program whereby

4

the federal government funds a portion of participating States' foster care costs, provided that those States administer their foster care programs in accordance with the Act.  *Id.* §§ 670 et seq.  To receive federal child welfare funds, participating States must submit a plan to the Department of Health and Human Services for approval (a "Title IV-E Plan").  42 U.S.C. §§ 671(a)-(b).

There are two specific provisions of the CWA at issue in this case, Sections 672 and 675(4)(A).  Acting together, these provisions require that participating States, such as New York, make "foster care maintenance payments" to reimburse licensed foster parents for specific categories of costs they incur in taking children into their care.  *Id.* at § 672(a)(1); 45 C.F.R. §§ 233.10, 1355.21, 1356.21.

Section 672 requires that "[e]ach State with a plan approved under this part *shall* make foster care maintenance payments on behalf of each [foster] child."  42 U.S.C. § 672(a)(1) (emphasis added).  Section 672(b) then specifies that an "individual" providing a "foster family home" is entitled to receive the foster care maintenance payments required under Section 672(a).  42 U.S.C. §672(b).  And "foster family home" is defined as a "foster family home for children which is licensed by the State in which it is situated."  42 U.S.C. § 672(c).  As the Ninth Circuit has explained "§ 672, read as a whole, establishes that participating States

5

must make foster care maintenance payments on behalf of each child to a foster care provider such as individual foster parents." *Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 980 (9th Cir. 2010).

The second provision of the CWA at issue in this case, Section 675(4)(A), defines the term "foster care maintenance payments" to mean:

> . . . payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement.

*Id.* § 675(4)(A).

Congress expressly has contemplated that certain provisions of the CWA may be privately enforced under Section 1983. In response to the Supreme Court's decision in *Suter v. Artist M.*, 503 U.S. 347 (1992), which rejected a private right of action under a different provision of the CWA (Section 671(a)(15)), Congress enacted the following amendment:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. *This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements* other than by overturning any such grounds

6

> applied in *Suter v. Artist M.*, [503 U.S. 347,] 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. § 1320a-2 (emphasis added). This amendment, known as the *Suter* fix, explicitly permits courts to find private rights of action—notwithstanding the fact that the CWA contains a case plan requirement—to enforce provisions of the CWA *other* than Section 671(a)(15).

### B. The Children's Coalition's Lawsuit

New York reimburses its foster parents at a rate far below the amount necessary to cover the actual cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement, as required by Section 675(4)(A). [A19] Indeed, New York currently pays less to foster parents to care for a child than a kennel charges to board and feed a dog. [A19-A20] In fact, New York's foster care maintenance payment rates fall 32% to 43% below the real cost of providing the items enumerated in Section 675(4)(A) based on consumer expenditure data. [A20-A21]

7

The State would have this Court hold that foster parents need not intervene in the process by which maintenance payments are calculated, because New York State has it covered. There is no factual support for that argument. New York's foster care maintenance payment rates were established by the State's Office of Children and Family Services ("OCFS") in the 1970s, before the CWA was even enacted. *See* Plaintiff's Local Rule 56.1 Statement of Material Facts Not In Dispute at 5, *N.Y. State Citizens' Coal. for Children v. Gladys Carrion*, No. 10 Civ. 3485 (WFK) (RER) (E.D.N.Y. Oct. 5, 2012), ECF No. 48. But OCFS officials charged with rate setting do not know how those rates were established, and OCFS has never recalculated those rates. *Id.* at 6. Further, OCFS has never undertaken or considered any studies of what it actually costs to provide the items enumerated in the CWA in connection with rate setting. *Id.* In fact, OCFS does not track the costs of any of the items required to be covered by the CWA. *Id.* Rather, any increases to the rates are based on what OCFS believes the state legislature will approve as a matter of budgetary policy, even when consumer price data dictates that a higher increase in the rates is necessary to match rising prices. *Id.* at 8.

Given New York's complete failure to comply with the CWA, the Children's Coalition filed this lawsuit to ensure that foster parents receive money

that they are entitled to receive to care for some of the neediest children in New York.

### C.    The District Court's Ruling

The district court dismissed plaintiffs' complaint, concluding that Sections 672 and 675 are not enforceable under 42 U.S.C. § 1983. At the outset, the district court expressed significant skepticism that any provision of the CWA could be enforced under Section 1983. [A32-A33]. The district court considered "persuasive" the argument that Congress's failure to create private rights of action in subsequent amendments to the CWA evinced an intent by Congress to foreclose private rights of action under that statute. [A35]. But that ignores the whole point of the *Suter* fix: private rights of action exist under the CWA, and each section of the CWA needs to be separately evaluated to determine whether Congress intended to create a private right of action.

Here, Section 672(a)(1) requires that States "shall make foster care maintenance payments on behalf of each child." 42 U.S.C. § 672(a)(1). Section 672(b) designates foster care providers, including foster parents, as the recipients of the payments made on behalf of the children in their care. *Id*. § 672(b). Despite this clear directive that New York must pay the foster parents of each child an amount sufficient to provide the care required by the CWA, the district court

9

interpreted Section 672(a)(1) as nothing more than a means to describe "how and when a State will act in order to qualify for federal funding." [A41]. Unable to sustain its decision by focusing on the plain meaning of Section 672(a)(1), as it was charged to do, the district court engaged in wordsmithing, holding that "if the statute were worded differently, and § 672(a)(1) read: 'No eligible child shall be denied foster care maintenance payments by a State with an approved plan,' a reasonable reader might find the requisite 'rights-creating' language." [A42]. But the district court determined that "that language is not present within § 672." *Id*.

Next, the district court held that the CWA's foster care maintenance payment provisions "have an aggregate, not individual focus"—ignoring both the unambiguous reference to "each child" in Section 672(a)(1), and the majority of courts that have considered this issue. Instead, the district court followed the Eighth Circuit's decision in *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190 (8th Cir. 2013) ("*Midwest Foster Care*"), and reasoned that the CWA's "[f]ocus[] on substantial compliance is tantamount to focusing on the aggregate practices of a State funding recipient." [A45].

Finally, the district court acknowledged that "there is no direct federal review of the claims of individual providers." [A49]. The district court determined, however, that "the absence of a [ ] federal mechanism is not fatal to

10

Defendant's position" because "the other elements of *Gonzaga's* analysis of *Blessing's* first prong strongly tilt against the finding of an unambiguous intent to create an individually enforceable right."  [A50] (quoting *Midwest Foster Care*).

## SUMMARY OF THE ARGUMENT

Sections 672 and 675(4)(A) contain clear, unambiguous statutory language evidencing Congress's intent to confer rights on foster children and their providers, including foster parents, to monthly maintenance payments that cover the cost of basic necessities under the CWA.  Section 672(a)(1) provides that States "shall" make these monthly maintenance payments "on behalf of each child," and Section 672(b) identifies foster care providers, including foster parents, as the recipients of the payments made on behalf of the children in their care.

Rather than follow this express mandate from Congress, the district court committed several errors:

***First***, the district court failed to acknowledge the clear, unambiguous "rights-creating" language in Section 672—that States "shall make foster care maintenance payments."  A majority of the courts to have considered this issue— the Ninth Circuit and four district courts—have construed this type of mandatory language as rights-creating.  As the Ninth Circuit correctly held in *Wagner*, "§ 672, read as a whole, establishes that participating States must make foster care

11

maintenance payments on behalf of each child to a foster care provider such as individual foster parents." *Wagner*, 624 F.3d at 980. The district court erred in departing from this precedent.

*Second*, the district court erroneously concluded that the CWA's foster care maintenance payment provisions have an "aggregate" focus and "do not emphasize whether the needs of any particular [foster care provider] have been satisfied." [A44] (quotations and citations omitted). But Section 672 provides that foster care maintenance payments must be made "on behalf of *each* child" and Section 675 specifies the basic goods and services that these maintenance payments must cover. *See* 42 U.S.C. §§ 672(a)(1), 675(4)(A) (emphasis added). Indeed, in *Rabin v. Wilson-Coker*, this Court held that statutory language nearly identical to Section 672(a)(1) is privately enforceable because it "focuses much more directly" on the right to an individual's entitlement than other provisions courts have held are not rights creating. 362 F.3d 190, 201 (2d Cir. 2004). The same is true here: "the language throughout [Sections 672 and 675] focuses on the needs of individual foster children." *See, e.g.*, *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 292 (N.D. Ga. 2003). And "§ 672[ ]'s specific language designating foster care providers to receive payments on foster children's behalf together

12

unambiguously reflect Congress's intent that foster care maintenance payments benefit individual foster parents." *Wagner*, 624 F.3d at 981.

Further, the district court wrongly concluded that the presence of a general, substantial compliance regime in the CWA and the statute's statement of purpose trump the specific, rights-creating language in Section 672. But basic statutory construction principles dictate that specific statutory provisions trump more general provisions—not the other way around. Moreover, were the district court correct, those conclusions would bar any individually enforceable right under the CWA. In enacting the *Suter* fix, however, Congress contemplated no such bar; rather, Congress explained that other provisions of the CWA might be enforceable under Section 1983.

***Third***, the district court mistakenly downplayed the fact that there is no federal review mechanism that foster parents can invoke to ensure that States make foster care maintenance payments that cover the costs of basic necessities. Under *Gonzaga*, the absence of a federal review mechanism weighs in favor of finding a privately enforceable right. But under the district court's reasoning, foster children and their parents have no recourse, even where (as here) States pay *de minimis* foster care maintenance payments that fall far short of covering the cost of providing the goods and services specified in Section 675(4)(A).

13

***Finally***, although not addressed by the district court, the remaining *Blessing* factors weigh in favor of finding a private right of action. These factors address: (1) whether the right is so vague that enforcement will strain judicial competence; and (2) whether the right is couched in mandatory, rather than precatory terms. Because Section 675(4)(A) contains an explicit and detailed list of goods and services that must be covered, determining the proper foster care maintenance payment rate requires little more than consumer pricing data and a calculator. This type of calculation will not strain judicial competence. Further, there can be no dispute that Section 672's requirement that States "*shall* make foster care maintenance payments" is couched in mandatory terms. For these reasons, and those that follow, the Court should reverse and remand so that the district court can adjudicate this case on the merits.

## STANDARD OF REVIEW

The district court dismissed the complaint for lack of standing. This Court "review[s] *de novo* a district court's dismissal of a complaint for lack of standing." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009).

## ARGUMENT

Congress intended the foster care maintenance payment provisions of the CWA to be enforceable under Section 1983. Whether a statute creates a federal

14

right enforceable under Section 1983 relies upon the three-prong test from *Blessing v. Freestone*, 520 U.S. 329 (1997). This inquiry asks: (1) whether Congress intend that the right in question benefit the plaintiff; (2) whether the plaintiff has demonstrated that the right is not so vague and amorphous that its enforcement would strain judicial competence; and (3) whether the provision giving rise to the right is couched in mandatory, rather than precatory, terms. *See id.* at 340-41. In *Gonzaga*, the Supreme Court clarified that the first prong of the *Blessing* test is meant to determine whether Congress "unambiguously conferred" a federal right. *Gonzaga Univ. v. Doe.*, 536 U.S. 273, 283 (2002). The first *Blessing* prong is satisfied if the statutory provision includes "rights-creating" language and has an individual, rather than aggregate focus. *Gonzaga*, 536 U.S. at 285-90. The Court also considers whether the statute provides for a federal review mechanism. *Id.*; *see NextG Networks of N.Y., Inc. v. City of N.Y.*, 513 F.3d 49, 52 (2d Cir. 2008).

The Ninth Circuit and four district courts have held that the foster care maintenance payment provisions are privately enforceable; only the Eighth Circuit has ruled otherwise.[1] This Court should join the majority of courts to have considered the issue and reverse the district court.

---

[1] The Ninth Circuit and four district courts have held that the CWA's foster care maintenance payment provisions are enforceable under Section 1983. *See,*

15

I.   **THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT CONGRESS DID NOT INTEND FOR THE FOSTER CARE MAINTENANCE PROVISIONS TO BENEFIT PLAINTIFFS.**

The district court erred in its application of *Gonzaga* to the first *Blessing* prong—whether Congress "intended that the provision in question benefit the plaintiff." *Blessing*, 520 U.S. at 340; *Gonzaga*, 536 U.S. at 285-90. Like other privately enforceable rights under the CWA, Sections 672 and 675(4)(A) evince a strong congressional intent that there is an enforceable right to receive foster care maintenance payments. Because the district court misapplied *Gonzaga* and did not even address the remaining *Blessing* prongs, reversal is required.

A.   **The Foster Care Maintenance Provisions Contain Express "Rights Creating" Language.**

The plain language of Sections 682(a)(1) and 675(4)(A) contain "rights-creating language" stated in "mandatory, rather than precatory, terms." *Gonzaga*, 536 U.S. at 295 (quoting *Blessing*, 520 U.S. at 340-41).

---

*e.g.*, *Wagner*, 624 F.3d 974; *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 172 (D. Mass. 2011); *Sam M. ex rel. Elliot v. Chafee*, 800 F. Supp. 2d 363, 384 n.25 (D.R.I. 2011); *C.H. v. Payne*, 683 F. Supp. 2d 865, 878 (S.D. Ind. 2010); *Kenny A.*, 218 F.R.D. at 294. Before the Eighth Circuit issued its decision in *Midwest Foster Care*, district courts in that Circuit had ruled both against and in favor of finding a private right of action. *Compare Midwest Foster Care & Adoption Ass'n v. Kinkade*, No. 11-cv-01152-DW (W.D. Mo. filed Mar. 9, 2012) *with Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1042 (W.D. Mo. 2003).

16

Section 672(a)(1) expressly provides: "Each State with a plan approved under this part *shall* make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . into foster care." 42 U.S.C. § 672(a)(1) (emphasis added). This mandatory rights-creating language unmistakably focuses on "each child who has been removed from the home of a relative . . . into foster care"—it provides an individual right to benefits, not an amorphous entitlement to aggregate or system wide benefits from the State.

In numerous similar contexts, courts have consistently construed this type of mandatory language as rights creating. The use of "shall" demonstrates that Congress "intended to bind the States." *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005); *see, e.g.*, *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 182, 189 n.4 (3d Cir. 2004) (holding that Medicaid provision requiring that States "must provide ... medical assistance ... to ... all [eligible] individuals" and that "such assistance *shall* be furnished with reasonable promptness to all eligible individuals" created a privately enforceable right) (emphasis added); *Doe v. Kidd*, 501 F.3d 348 (4th Cir. 2007) (same); *Romano v. Greenstein*, 721 F.3d 373 (5th Cir. 2013) (same). And the use of the individualized "each child" language demonstrates that Congress was "directly concerned with 'whether the needs of any particular person have been satisfied.'"

17

*See Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 524, 527 (3d Cir. 2009) (recognizing a private right of action under 42 U.S.C. § 1396r(b)(2)(A)) (quoting *Blessing*, 520 U.S. at 343); *see Conner B.*, 771 F. Supp. 2d at 171 (explaining that the language in Section 672 is "unmistakably focused on the benefitted class, *i.e.* foster children"). Indeed, with respect to the very provisions at issue here, the Ninth Circuit reached the opposite conclusion of the district court and held that the foster care maintenance provisions employ rights-creating language enforceable under Section 1983. *Wagner*, 624 F.3d at 980.

The district court should not have ignored these principles and should not have rejected this persuasive precedent. In *Wagner*, the Ninth Circuit held: "The CWA unambiguously designates foster parents as one of three types of recipients who can receive funds on foster children's behalf." *Id.* at 979. The Ninth Circuit explained that the foster care maintenance provisions "establish[] that participating States must make foster care maintenance payments on behalf of each child to a foster care provider such as individual foster care parents." *Id.* at 980. To that end, "§ 672 of the CWA focuses squarely on the individuals protected, rather than the entities regulated." *Id.* Thus, "the foster care providers' relationship with the statutory guarantee is direct … the CWA contemplates payments directly to

18

providers, and the providers seek enforcement of that right." *Id*. (citations and quotations omitted).

Rather than follow *Wagner*, the district court side-stepped the express "rights creating" language in the foster care maintenance provisions. Relying on the Eighth Circuit's decision in *Midwest Foster Care*, the district court "beg[an] with" the *definition* of "foster care maintenance" in Section 675(4)(A) instead of the prescriptive language of Section 672. [A40] (citing *Midwest Foster Care*, 712 F.3d at 1197). Having narrowed the inquiry to the definitional language, the district court held that "[t]o infer a private right of action from a definitional section is antithetical to the mandate that a private right in a federal statute does not exist 'unless Congress speaks with a clear voice and mandates an unambiguous intent to confer individual rights'." *Id.* (citing *Midwest Foster Care*, 712 F.3d at 1197).

That was error. Plaintiffs here did not bring their suit based on Section 675's definition in isolation. [A16] (invoking Section 672(a)(1)). Nothing in *Gonzaga* precludes the existence of an enforceable federal right simply because part of the contours of that right is set forth in a statutory provision entitled "Definitions." Nor could it. Statutory provisions, even rights-creating ones, are not meant to be read in isolation. As this Court has explained: "The meaning of a

19

particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 237 (2d Cir. 2011) (citations omitted); *see also*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) ("[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (citations omitted).

Under the correct analysis, Section 672(a) is the "provision creating a right" and Section 675(4)(A) is the "provision 'spelling out the content' of that right.'" *Wagner*, 624 F.3d at 979; *cf. Cal. Alliance of Child & Family Servs. v. Allenby*, 589 F.3d 1017, 1022 (9th Cir. 2009) ("*Allenby II*") (the "conditions [of accepting federal child welfare funds] are clear—the State must pay for the cost of listed items [in Section 675(4)(A)]").

Moreover, two other Circuits (including the First and Ninth Circuit) have concluded that other provisions of the CWA are privately enforceable under Section 1983, even where the "Definitions" in Section 675 provide further context to the federal right to be enforced. *See ASW v. Or.*, 424 F.3d 970, 977 (9th Cir. 2005) (finding that Section 673(a)(3) creates a privately enforceable right to adoption assistance payments under the "adoption assistant agreements" defined in

20

Section 675(3)); *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983) (holding that there is a private right under Section 671(a)(16) to enforce the case review system described in Section 675(5)(B)). And the Fourth Circuit has permitted such actions to go forward. *L.J. v. Wilbon*, 633 F.3d 297, 312 (4th Cir. 2011) (holding that Section 671(a)(16) could support a private right of action and that the Supreme Court's decision in *Suter* did not bar such a finding). Consistent with the sound reasoning in those cases, this Court should find a private right of action under Section 672(a)(1)).[2]

Nor was the district court correct that Section 672(a) simply "focuses on how and when a State will act in order to *qualify* for federal funding." [A41] (emphasis added). Section 672(a)(1) is not about qualification to be eligible for federal CWA funds. It is an express mandate for those States that have already qualified and accepted federal funding. The statute thus creates an individualized right for foster care maintenance payments by imposing an obligation on "[e]ach State with a plan approved under this part" to make foster care maintenance payments for *each* eligible child. 42 U.S.C. § 672(a)(1) (emphasis added). In

---

[2] This case is unlike the Eleventh Circuit's decision in *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), upon which the district court relied. [A40] 12. The plaintiffs there (unlike here) brought their action under Section 675. *31 Foster Children*, 329 F.3d at 1270.

21

other words, Section 672(a)(1) employs rights creating language because it is directed at States that already participate in and receive funds through the federal child welfare program.

**B. The Foster Care Maintenance Provisions Have An Individualized Focus.**

**1.  *Sections 672(a)(1) and 675(4)(A) focus on the needs of "each" foster child and foster care providers.***

The district court also concluded that the CWA's foster care maintenance payment provisions are not enforceable because they "do not emphasize whether the needs of any particular foster care provider have been satisfied."  [A44] (internal quotations and brackets omitted).  But that argument simply cannot be reconciled with the text of the CWA.  The plain language of the foster care maintenance provisions have an individualized, rather than aggregate, focus and thus meet *Gonzaga*'s requirements.  *Gonzaga*, 536 U.S. at 288.

The CWA requires "payments on behalf of each child," 42 U.S.C. § 672(a)(1); this language focuses on the individual (each child) rather than the aggregate (policies and practices).  As other courts have explained, "the language throughout these provisions focuses on the needs of individual foster children, rather than having a systemwide or aggregate focus."  *Kenny A.*, 218 F.R.D. at 292; *see Wagner*, 624 F.3d at 980; *Conner B.*, 771 F. Supp. 2d at 171.

22

"§ 672[ ]'s specific language designating foster care providers to receive payments on foster children's behalf together unambiguously reflect Congress's intent that foster care maintenance payments benefit individual foster parents." *Wagner*, 624 F.3d at 981.

In addition, the district court did not even address Section 675(4)(A) when it concluded that the foster care maintenance provisions were not sufficiently individualized. But that provision expressly identifies the specific categories of costs that foster care maintenance payments must cover in order to meet the needs of individual children in foster care. In conjunction with Section 672(a), Section 675(4)(A) requires "payments to cover the cost of (and the cost of providing)" explicit categories of goods and services, including food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. *See* 42 U.S.C. § 675(4)(A). These particular enumerations in the statutory text further underscore that Congress's focus in the foster care maintenance provisions was on the individual needs of each child in foster care, as opposed to aggregate or systemic benefits for the foster care system in general.

23

### 2. The CWA's "substantial conformity" requirement does not undermine the existence of an enforceable federal right.

Rather than follow the explicit text of the foster care maintenance provision, the district court noted "[t]hat a State need only be in 'substantial conformity' with the CWA's requirements to receive federal funding." [A44]. The district court concluded that that "strongly suggests that the statute has an aggregate focus." *Id.*

That finding is contradicted by (a) the district court's recognition that "standing alone, a substantial compliance regime does not establish that a statute has an aggregate focus" [A45]; and (b) the decision in *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 512 (1990), where the Supreme Court held that an enforceable private right of action existed under Section 1983 despite the presence of a compliance regime. Like the CWA provisions at issue here, the statutory provision in *Wilder* included a State plan requirement and mandated that "[t]he State plan '*must*' 'provide for payment ... of hospital[s]' according to rates the State finds are reasonable and adequate." *Wilder*, 496 U.S. at 512 (citing 42 U.S.C. § 1396a(a)(13)(A)). The Supreme Court held that that express mandate—that States "must provide" certain payments—overcame the fact that the federal government could withhold funds for noncompliance. *Id.* Indeed, like here, the statute at issue in *Wilder* provides that the "provision of federal funds is expressly conditioned on

24

compliance with the amendment and the Secretary is authorized to withhold funds for noncompliance with this provision." *Id*. (citing 42 U.S.C. § 1396c).

Similarly, this Court rejected a defendant's argument that no private right of action existed under the Medicaid statute income assistance provisions simply because funds could be withheld for noncompliance. *See Rabin*, 362 F.3d at 201; *see* 42 U.S.C. § 1396(c).

Simply put, the district court's conclusion, if adopted by this Court, would preclude the private enforcement of *any* provision of the CWA due to the "substantial conformity" requirement. But that would ignore the other courts that have reached a contrary conclusion with respect to a number of different provisions of the CWA. *See ASW v. Or.*, 424 F.3d at 975-977 (finding that Section 673(a)(3) creates a privately enforceable right); *Lynch v. Dukakis*, 719 F.2d 504 (holding that there is a private right under Section 671(a)(16)); *cf. L.J. v. Wilbon*, 633 F.3d at 312 (holding that Section 671(a)(16) could support a private right of action and that the Supreme Court's decision in *Blessing* did not bar such a finding).

Nor is the district court correct that this case is closer to *Gonzaga* than *Wilder*. [A46]. The text of the Family Educational Rights and Privacy Act ("FERPA") at issue in *Gonzaga* bears little similarity to the CWA provisions at

25

issue here.  The relevant language in FERPA provided:  "[n]o funds shall be made available … to any educational agency or institution which has a policy or practice of permitting the release of education records … of students without the written consent of their parents."  20 U.S.C. § 1232g(b)(1).  Unlike the CWA provisions at issue here, that language simply triggers a funding prohibition if a State adopts certain policies or practices that might be to the detriment of students.  As this Court has explained, FERPA did not create individual rights because "the statute only forbade the government from funding schools that demonstrated a 'policy or practice' of disclosing student records."  *Rabin*, 362 F.3d at 201 (citing *Gonzaga*, 536 U.S. at 287); *see Wagner*, 624 F.3d at 980 ("The Court [ ] stressed that the [FERPA] provision had an 'aggregate focus' on the 'institutional policy and practice' rather than focusing on 'individual instances' of non-compliance.").

As the Ninth Circuit correctly held, the CWA's foster care maintenance payments provisions at issue here—Sections 672 and 675(4)(A)—"focus[] squarely on the individuals protected, rather than the entities regulated."  *Id.* Statutory language providing that (1) States "shall" make foster care maintenance payments "on behalf of each child"; (2) identifying foster parents as the proper recipients of the payments made "on behalf of each child"; and (3) specifically defining what costs those payments must cover underscores that "the CWA

26

contemplates payments directly to providers, and the providers [can] seek enforcement of that right." *Id.* (citing *Cal. Alliance of Child & Family Servs. v. Allenby*, 459 F. Supp. 2d 919, 924 (N.D. Cal. 2006) ("*Allenby I*")).[3]

Moreover, this Court's precedent supports the conclusion that the CWA's foster care maintenance payment provisions are distinguishable from *Gonzaga* and have an individual focus. In *Rabin*, this Court determined that similar language in a provision of the Medicaid Act, 42 U.S.C. Section 1396r-6, gave rise to individually enforceable rights. *See Rabin*, 362 F.3d at 201-202. The statute at issue in *Rabin* provided that "each State plan approved under this subchapter must provide that each family which was receiving [aid] in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid, because of ... income from employment ... remain eligible for assistance under the plan ... during the immediately succeeding 6–month period." *Id.* at 201 (quoting 42 U.S.C. Section 1396r-6). This Court held that the language in Section 1396r-6 "focuses much more [closely] than does the FERPA provision on the

---

[3] In reaching the contrary conclusion, the district court did not cite any language in either Section 672(a) or 675(4)(A) similar to FERPA's express funding prohibition—that "[n]o funds shall be made available"—or "policy and practice" language. [A46]. This is unsurprising because no such language exists in those provisions of the CWA. 42 U.S.C. §§ 672(a), 675(4)(A).

27

individual's entitlement," noting that "[i]n particular, it contains no qualifying language akin to FERPA's 'policy or practice'." *Id*.

This Court's reasoning in *Rabin* applies with equal force here and should be fatal to the district court's ruling. Both Section 1396r-6 and Section 672(a)(1) provide that States with approved plans take specific actions with respect to specific beneficiaries. Section 1396r-6 provides that States with approved plans "*must provide*" aid to "*each family*" who had previously received Medicaid benefits under certain circumstances. 42 U.S.C. § 1396r-6 (emphasis added). Section 672(a)(1) likewise provides that States with approved Title IV-E Plans "*shall make* foster care maintenance payments on behalf of *each child*" who meets certain criteria. *See* 42. U.S.C. § 672(a)(1) (emphasis added). And unlike the FERPA, Sections 672(a)(1) and 675(4)(A) "contain[] no qualifying language akin to FERPA's 'policy or practice.'" *Rabin*, 362 F.3d at 201. Instead, Sections 672 and 675(4)(A) focus on the entitlement of "each child" under the statute. *Rabin*, 362 F.3d at 201.

Accordingly, the district court erred because the CWA's foster care maintenance payment provisions are nothing like the provisions at issue in *Gonzaga* and nearly identical to statutory language that this Court has found to give rise to rights enforceable through Section 1983.

28

### 3. The CWA's purpose does not trump the specific statutory language in Section 672(a).

Finally, the district court erred by concluding that the CWA's general declaration of purpose militated toward there not being an enforceable right. [A47] ("[t]he final indication that the CWA, generally, has an aggregate, as opposed to individual focus, is the statute's declaration of purpose."). The proper focus, however, is the specific statutory language at issue. *See Blessing*, 520 U.S. at 342 (noting that the Supreme Court's private right of action analysis does not "ask whether the federal … legislation generally [gives] rise to rights; rather we focus[] our analysis on a specific statutory provision"). And it is well settled that specific statutory language is not trumped by more general language. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 132 S. Ct. 2065, 2071 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general") (citation omitted); *U.S. v. Torres-Echavarria*, 129 F.3d 692, 699 n.3 (2d Cir. 1997) ("The operative principle of statutory construction is that a specific provision takes precedence over a more general provision").

The district court's reliance on the CWA's declaration of purpose to trump the specific language in Section 672(a)(1) effectively precludes finding *any* private right of action in the CWA. *See, e.g.*, *L.J. v. Wilbon*, 633 F.3d at 309 ("Whether a plaintiff has a right to bring an action under a particular provision of AACWA

29

requires a section-specific inquiry"); *cf. Taylor v. Vt. Dep't of Ed.*, 313 F.3d 768, 783 (2d Cir. 2002) (declining to "determine whether *Gonzaga's* express holding [as to a particular statutory subsection] applies to [the whole statutory section] in its entirety"). But that cannot be reconciled with Congress's explicit decision—through the *Suter* fix—to leave the door open for federal courts individually examine whether provisions of the CWA might give rise to privately enforceable rights.

Congress could not have been clearer in enacting the *Suter* fix: although Congress did not overturn the result in *Suter*, Congress mandated that certain reasoning in *Suter* was wrong and that courts could consider whether *other* provisions of the CWA might be privately enforceable rights. If there were no possibility of private rights of action under other provisions of the CWA, there would be no reason for Congress to enact language refusing "to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements." *See Sam M.*, 800 F. Supp. 2d at 388 ("the [1994] amendment …expressed Congress's intent *not* to preclude courts from determining whether *other* provisions of the AACWA allowed private enforcement actions") (emphasis in original); *see also Rabin*, 362 F.3d at 201-02 (holding that "Section 1320a-2

30

precludes [the] defendant from relying on the plan requirement language" in arguing against a private right of action).

### C. There Is No Effective Federal Review Mechanism To Enforce Foster Parents' Rights Under The Foster Care Maintenance Provisions.

The absence of a federal review mechanism under the CWA's foster care maintenance payment provisions "is a relevant consideration that weighs in [f]oster [p]arents' favor." *Wagner*, 624 F.3d at 982.

The district court acknowledged that there is no federal review mechanism that foster parents can invoke to ensure that States make foster care maintenance payments that cover the costs of basic necessities. [A49] The district court also acknowledged that the absence of such a review mechanism distinguishes the statutory provisions at issue here from the FERPA provisions in *Gonzaga*. *See id*. (distinguishing the CWA's foster care maintenance payment provisions from FERPA because "'there is no direct federal review of the claims of individual providers.'") (citing *Midwest Foster Care*, 712 F.3d 1202). Nevertheless, the district court downplayed the absence of a federal review mechanism, "tak[ing] note" of what it characterized as "the extensive statutory scheme for helping wayward States return to 'substantial conformity'" with their Title IV-E Plans. [A50-A51].

That was error. An extensive statutory scheme is no substitute for a federal review mechanism to determine whether States are paying foster care providers CWA-compliant maintenance payment rates. This factors weighs heavily in favor of a private right of action. Otherwise, absent a private right of action for providers to enforce Sections 627(a)(1) and 675(4)(A), a recalcitrant State could nullify foster parents' rights by paying *de minimis* amounts as "foster care maintenance payments" and leave the intended beneficiaries of those reimbursements without recourse.

## II. THE REMAINING *BLESSING* FACTORS DEMONSTRATE A PRIVATE RIGHT OF ACTION UNDER SECTIONS 672(A)(1) AND 675(4)(A).

Because the district court erroneously concluded that Sections 672 and 675 do not contain "rights-creating" language, the district court did not address the remaining *Blessing* factors. [A50]. The second *Blessing* factor addresses whether the right asserted is "not so 'vague and amorphous' that its enforcement would strain judicial competence" and the third *Blessing* factor addresses whether the statutory language is "couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 340-41. Application of these remaining two factors further demonstrates that Sections 672 and 675 give rise to an enforceable right to foster care maintenance payments that cover the costs enumerated in Section 675(4)(A).

32

### A. Enforcement Of The Foster Care Maintenance Provisions Would Not Strain Judicial Competence.

Section 675(4)(A) of the CWA satisfies the second prong of the *Blessing* test because that section "contains an explicit and detailed provision for determining payments to foster care providers." *Allenby I*, 459 F. Supp. 2d at 925; *see also* 42 U.S.C. § 675(4)(A) (specifying the costs that maintenance payments must cover). The "combined effect of [Sections] 672(a) and 675(4)(A)" is to articulate a right through Section 672(a)(1) and to "spell[] out the content of that right" in Section 675(4)(A). *Wagner*, 624 F.3d at 979, 981; *see also Allenby II*, 589 F.3d at 1022 (the "conditions [of accepting federal child welfare funds] are clear—the State must pay for the cost of listed items [in Section 675(4)(A)"). Armed with the detailed list of items in Section 675(4)(A), and readily available data on the cost of those items, the maintenance rate computation is nothing more than basic arithmetic. *See Kenny A.*, 218 F.R.D. at 303 ("Although the actual costs of certain basic child care necessities such as food, clothing, and shelter may vary, the Court is equipped to determine whether the current foster care maintenance rates fall outside the range of reasonable payments necessary to provide adequate care for children in Fulton and DeKalb Counties"). Accordingly, the CWA's foster care maintenance payment provisions satisfy the second *Blessing* prong.

33

### B.  Section 672(a)(1) Is Couched In Mandatory Terms.

As the Ninth Circuit held in *Wagner*, Section 672(a)'s language is "clearly mandatory, satisfying the third and final Blessing factor."  624 F.3d at 982.  The plain language of the statute— that States "shall make foster care maintenance payments"—is couched in mandatory terms.   *See* 42 U.S.C. § 672(a)(1); *Ala. v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily the language of command."); *see also Levine v. Apker*, 455 F.3d 71, 74, 80 (2d Cir. 2006) (holding that a statute requiring that the "Bureau of Prisons *shall* designate the place of the prisoner's imprisonment" to be mandatory language).  Nothing more is required for this *Blessing* prong to be satisfied.

34

## CONCLUSION

For the foregoing reasons, the Children's Coalition respectfully requests that this Court enter an order reversing the District Court's decision and remanding this case so that the Children's Coalition's claims can be decided on the merits.

Respectfully submitted,

Dated:  November 18, 2014

/s/ Grant J. Esposito
GRANT J. ESPOSITO
ADAM J. HUNT
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Telephone:  (202) 887-1500

Attorneys for Plaintiff-Appellant New York State Citizens' Coalition For Children

35

# CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that the foregoing brief complies with the type volume limitation set forth under Federal Rule of Appellate Procedure 32(a)(7)(B), that the word processing system used to prepare the brief indicates it contains 7,590 words, and that the brief uses a proportionately-spaced font of 14-point type.


Dated:  November 18, 2014          /s/ Grant J. Esposito
                                   GRANT J. ESPOSITO

ADDENDUM

# STATUTORY ADDENDUM

| **DESCRIPTION** | **PAGE** |
| --- | --- |
| 42 U.S.C. § 672 | 1a |
| 42 U.S.C. § 675 | 6a |

## 42 U.S.C.A. § 672

## § 672. Foster care maintenance payments program

(a) In general

(1) Eligibility

Each State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative specified in section 606(a) of this title (as in effect on July 16, 1996) into foster care if--

> **(A)** the removal and foster care placement met, and the placement continues to meet, the requirements of paragraph (2); and

> **(B)** the child, while in the home, would have met the AFDC eligibility requirement of paragraph (3).

(2) Removal and foster care placement requirements

The removal and foster care placement of a child meet the requirements of this paragraph if--

> **(A)** the removal and foster care placement are in accordance with--

>> **(i)** a voluntary placement agreement entered into by a parent or legal guardian of the child who is the relative referred to in paragraph (1); or

>> **(ii)** a judicial determination to the effect that continuation in the home from which removed would be contrary to the welfare of the child and that reasonable efforts of the type described in section 671(a)(15) of this title for a child have been made;

> **(B)** the child's placement and care are the responsibility of—

>> **(i)** the State agency administering the State plan approved under section 671 of this title;

>> **(ii)** any other public agency with which the State agency administering or supervising the administration of the State plan has made an agreement which is in effect; or

(iii) an Indian tribe or a tribal organization (as defined in section 679c(a) of this title) or a tribal consortium that has a plan approved under section 671 of this title in accordance with section 679c of this title; and

(C) the child has been placed in a foster family home or child-care institution.

(3) AFDC eligibility requirement

(A) In general

A child in the home referred to in paragraph (1) would have met the AFDC eligibility requirement of this paragraph if the child--

(i) would have received aid under the State plan approved under section 602 of this title (as in effect on July 16, 1996) in the home, in or for the month in which the agreement was entered into or court proceedings leading to the determination referred to in paragraph (2)(A)(ii) of this subsection were initiated; or

(ii)(I) would have received the aid in the home, in or for the month referred to in clause (i), if application had been made therefor; or

(II) had been living in the home within 6 months before the month in which the agreement was entered into or the proceedings were initiated, and would have received the aid in or for such month, if, in such month, the child had been living in the home with the relative referred to in paragraph (1) and application for the aid had been made.

(B) Resources determination

For purposes of subparagraph (A), in determining whether a child would have received aid under a State plan approved under section 602 of this title (as in effect on July 16, 1996), a child whose resources (determined pursuant to section 602(a)(7)(B) of this title, as so in effect) have a combined value of not more than $10,000 shall be considered a child whose resources have a combined value of not more than $1,000 (or such lower amount as the State may determine for purposes of section 602(a)(7)(B) of this title).

(4) Eligibility of certain alien children

Subject to title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 [8 U.S.C. 1601 et seq.], if the child is an alien disqualified under section 1255a(h) of Title 8 or 1160(f) of Title 8 from receiving aid under the State plan approved under section 602

2a

of this title in or for the month in which the agreement described in paragraph (2)(A)(i) was entered into or court proceedings leading to the determination described in paragraph (2)(A)(ii) were initiated, the child shall be considered to satisfy the requirements of paragraph (3), with respect to the month, if the child would have satisfied the requirements but for the disqualification.

(b) Additional qualifications

Foster care maintenance payments may be made under this part only on behalf of a child described in subsection (a) of this section who is--

**(1)** in the foster family home of an individual, whether the payments therefor are made to such individual or to a public or private child-placement or child-care agency, or

**(2)** in a child-care institution, whether the payments therefor are made to such institution or to a public or private child-placement or child-care agency, which payments shall be limited so as to include in such payments only those items which are included in the term "foster care maintenance payments" (as defined in section 675(4) of this title).

(c) "Foster family home" and "child-care institution" defined

For the purposes of this part, (1) the term "foster family home" means a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing; and (2) the term "child-care institution" means a private child-care institution, or a public child-care institution which accommodates no more than twenty-five children, which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing or approval of institutions of this type, as meeting the standards established for such licensing, except, in the case of a child who has attained 18 years of age, the term shall include a supervised setting in which the individual is living independently, in accordance with such conditions as the Secretary shall establish in regulations, but the term shall not include detention facilities, forestry camps, training schools, or any other facility operated primarily for the detention of children who are determined to be delinquent.

(d) Children removed from their homes pursuant to voluntary placement agreements

Notwithstanding any other provision of this subchapter, Federal payments may be made under this part with respect to amounts expended by any State as foster care maintenance payments under this section, in the case of children removed from their homes pursuant to voluntary placement agreements as described in subsection (a) of this section, only if (at the time such amounts were expended) the State has fulfilled all of the requirements of section 622(b)(8) of this title.

(e) Placements in best interest of child

No Federal payment may be made under this part with respect to amounts expended by any State as foster care maintenance payments under this section, in the case of any child who was removed from his or her home pursuant to a voluntary placement agreement as described in subsection (a) of this section and has remained in voluntary placement for a period in excess of 180 days, unless there has been a judicial determination by a court of competent jurisdiction (within the first 180 days of such placement) to the effect that such placement is in the best interests of the child.

(f) "Voluntary placement" and "voluntary placement agreement" defined

For the purposes of this part and part B of this subchapter, (1) the term "voluntary placement" means an out-of-home placement of a minor, by or with participation of a State agency, after the parents or guardians of the minor have requested the assistance of the agency and signed a voluntary placement agreement; and (2) the term "voluntary placement agreement" means a written agreement, binding on the parties to the agreement, between the State agency, any other agency acting on its behalf, and the parents or guardians of a minor child which specifies, at a minimum, the legal status of the child and the rights and obligations of the parents or guardians, the child, and the agency while the child is in placement.

(g) Revocation of voluntary placement agreement

In any case where--

    **(1)** the placement of a minor child in foster care occurred pursuant to a voluntary placement agreement entered into by the parents or guardians of such child as provided in subsection (a) of this section, and

    **(2)** such parents or guardians request (in such manner and form as the Secretary may prescribe) that the child be returned to their home or to the home of a relative,

the voluntary placement agreement shall be deemed to be revoked unless the State agency opposes such request and obtains a judicial determination, by a court of competent jurisdiction, that the return of the child to such home would be contrary to the child's best interests.

(h) Aid for dependent children; assistance for minor children in needy families

    **(1)** For purposes of subchapter XIX of this chapter, any child with respect to whom foster care maintenance payments are made under this section is deemed to be a dependent child as defined in section 606 of this title (as in effect as of July 16, 1996) and deemed to be a recipient of aid to families with dependent children under part A of this subchapter (as so in

effect). For purposes of division A1 of subchapter XX of this chapter, any child with respect to whom foster care maintenance payments are made under this section is deemed to be a minor child in a needy family under a State program funded under part A of this subchapter and is deemed to be a recipient of assistance under such part.

**(2)** For purposes of paragraph (1), a child whose costs in a foster family home or child care institution are covered by the foster care maintenance payments being made with respect to the child's minor parent, as provided in section 675(4)(B) of this title, shall be considered a child with respect to whom foster care maintenance payments are made under this section.

(i) Administrative costs associated with otherwise eligible children not in licensed foster care settings

Expenditures by a State that would be considered administrative expenditures for purposes of section 674(a)(3) of this title if made with respect to a child who was residing in a foster family home or child-care institution shall be so considered with respect to a child not residing in such a home or institution--

**(1)** in the case of a child who has been removed in accordance with subsection (a) of this section from the home of a relative specified in section 606(a) of this title (as in effect on July 16, 1996), only for expenditures--

**(A)** with respect to a period of not more than the lesser of 12 months or the average length of time it takes for the State to license or approve a home as a foster home, in which the child is in the home of a relative and an application is pending for licensing or approval of the home as a foster family home; or

**(B)** with respect to a period of not more than 1 calendar month when a child moves from a facility not eligible for payments under this part into a foster family home or child care institution licensed or approved by the State; and

**(2)** in the case of any other child who is potentially eligible for benefits under a State plan approved under this part and at imminent risk of removal from the home, only if--

**(A)** reasonable efforts are being made in accordance with section 671(a)(15) of this title to prevent the need for, or if necessary to pursue, removal of the child from the home; and

**(B)** the State agency has made, not less often than every 6 months, a determination (or redetermination) as to whether the child remains at imminent risk of removal from the home.

**42 U.S.C.A. § 675**

**§ 675. Definitions**

As used in this part or part B of this subchapter:

**(1)** The term "case plan" means a written document which includes at least the following:

**(A)** A description of the type of home or institution in which a child is to be placed, including a discussion of the safety and appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title.

**(B)** A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.

**(C)** The health and education records of the child, including the most recent information available regarding--

**(i)** the names and addresses of the child's health and educational providers;

**(ii)** the child's grade level performance;

**(iii)** the child's school record;

**(iv)** a record of the child's immunizations;

**(v)** the child's known medical problems;

**(vi)** the child's medications; and

**(vii)** any other relevant health and education information concerning the child determined to be appropriate by the State agency.

**(D)** Where appropriate, for a child age 16 or over, a written description of the programs and services which will help such child prepare for the transition from foster care to independent living.

**(E)** In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include child specific recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems to facilitate orderly and timely in-State and interstate placements.

**(F)** In the case of a child with respect to whom the permanency plan is placement with a relative and receipt of kinship guardianship assistance payments under section 673(d) of this title, a description of--

    **(i)** the steps that the agency has taken to determine that it is not appropriate for the child to be returned home or adopted;

    **(ii)** the reasons for any separation of siblings during placement;

    **(iii)** the reasons why a permanent placement with a fit and willing relative through a kinship guardianship assistance arrangement is in the child's best interests;

    **(iv)** the ways in which the child meets the eligibility requirements for a kinship guardianship assistance payment;

    **(v)** the efforts the agency has made to discuss adoption by the child's relative foster parent as a more permanent alternative to legal guardianship and, in the case of a relative foster parent who has chosen not to pursue adoption, documentation of the reasons therefor; and

    **(vi)** the efforts made by the State agency to discuss with the child's parent or parents the kinship guardianship assistance arrangement, or the reasons why the efforts were not made.

**(G)** A plan for ensuring the educational stability of the child while in foster care, including--

    **(i)** assurances that each placement of the child in foster care takes into account the

appropriateness of the current educational setting and the proximity to the school in which the child is enrolled at the time of placement; and

**(ii)(I)** an assurance that the State agency has coordinated with appropriate local educational agencies (as defined under section 7801 of Title 20) to ensure that the child remains in the school in which the child is enrolled at the time of each placement; or

**(II)** if remaining in such school is not in the best interests of the child, assurances by the State agency and the local educational agencies to provide immediate and appropriate enrollment in a new school, with all of the educational records of the child provided to the school.

**(2)** The term "parents" means biological or adoptive parents or legal guardians, as determined by applicable State law.

**(3)** The term "adoption assistance agreement" means a written agreement, binding on the parties to the agreement, between the State agency, other relevant agencies, and the prospective adoptive parents of a minor child which at a minimum (A) specifies the nature and amount of any payments, services, and assistance to be provided under such agreement, and (B) stipulates that the agreement shall remain in effect regardless of the State of which the adoptive parents are residents at any given time. The agreement shall contain provisions for the protection (under an interstate compact approved by the Secretary or otherwise) of the interests of the child in cases where the adoptive parents and child move to another State while the agreement is effective.

**(4)(A)** The term "foster care maintenance payments" means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

**(B)** In cases where--

**(i)** a child placed in a foster family home or child-care institution is the parent of a son or daughter who is in the same home or institution, and

**(ii)** payments described in subparagraph (A) are being made under this part with respect to

such child,

the foster care maintenance payments made with respect to such child as otherwise determined under subparagraph (A) shall also include such amounts as may be necessary to cover the cost of the items described in that subparagraph with respect to such son or daughter.

**(5)** The term "case review system" means a procedure for assuring that--

**(A)** each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child, which--

**(i)** if the child has been placed in a foster family home or child-care institution a substantial distance from the home of the parents of the child, or in a State different from the State in which such home is located, sets forth the reasons why such placement is in the best interests of the child, and

**(ii)** if the child has been placed in foster care outside the State in which the home of the parents of the child is located, requires that, periodically, but not less frequently than every 6 months, a caseworker on the staff of the State agency of the State in which the home of the parents of the child is located, of the State in which the child has been placed, or of a private agency under contract with either such State, visit such child in such home or institution and submit a report on such visit to the State agency of the State in which the home of the parents of the child is located,

**(B)** the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review (as defined in paragraph (6)) in order to determine the safety of the child the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption or legal guardianship,

**(C)** with respect to each such child, (i) procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the State of a permanency hearing to be held, in a family or juvenile court or another court (including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court, no later than 12 months after the date the child is considered to have entered foster care (as determined under subparagraph (F)) (and not less frequently than every 12 months thereafter during the continuation of foster care), which hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights,

or referred for legal guardianship, or (in cases where the State agency has documented to the State court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, or be placed for adoption, with a fit and willing relative, or with a legal guardian) placed in another planned permanent living arrangement, in the case of a child who will not be returned to the parent, the hearing shall consider in-State and out-of-State placement options, and, in the case of a child described in subparagraph (A)(ii), the hearing shall determine whether the out-of-State placement continues to be appropriate and in the best interests of the child, and, in the case of a child who has attained age 16, the services needed to assist the child to make the transition from foster care to independent living; (ii) procedural safeguards shall be applied with respect to parental rights pertaining to the removal of the child from the home of his parents, to a change in the child's placement, and to any determination affecting visitation privileges of parents; and (iii) procedural safeguards shall be applied to assure that in any permanency hearing held with respect to the child, including any hearing regarding the transition of the child from foster care to independent living, the court or administrative body conducting the hearing consults, in an age-appropriate manner, with the child regarding the proposed permanency or transition plan for the child;[1]

**(D)** a child's health and education record (as described in paragraph (1)(A)) is reviewed and updated, and a copy of the record is supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care, and is supplied to the child at no cost at the time the child leaves foster care if the child is leaving foster care by reason of having attained the age of majority under State law;[1]

**(E)** in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, or, if a court of competent jurisdiction has determined a child to be an abandoned infant (as defined under State law) or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition), and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless--

    **(i)** at the option of the State, the child is being cared for by a relative;

    **(ii)** a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or

    **(iii)** the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the

child to the child's home, if reasonable efforts of the type described in section 671(a)(15)(B)(ii) of this title are required to be made with respect to the child;[1]

**(F)** a child shall be considered to have entered foster care on the earlier of--

**(i)** the date of the first judicial finding that the child has been subjected to child abuse or neglect; or

**(ii)** the date that is 60 days after the date on which the child is removed from the home;[1]

**(G)** the foster parents (if any) of a child and any preadoptive parent or relative providing care for the child are provided with notice of, and a right to be heard in, any proceeding to be held with respect to the child, except that this subparagraph shall not be construed to require that any foster parent, preadoptive parent, or relative providing care for the child be made a party to such a proceeding solely on the basis of such notice and right to be heard;

**(H)** during the 90-day period immediately prior to the date on which the child will attain 18 years of age, or such greater age as the State may elect under paragraph (8)(B)(iii), whether during that period foster care maintenance payments are being made on the child's behalf or the child is receiving benefits or services under section 677 of this title, a caseworker on the staff of the State agency, and, as appropriate, other representatives of the child provide the child with assistance and support in developing a transition plan that is personalized at the direction of the child, includes specific options on housing, health insurance, education, local opportunities for mentors and continuing support services, and work force supports and employment services, includes information about the importance of designating another individual to make health care treatment decisions on behalf of the child if the child becomes unable to participate in such decisions and the child does not have, or does not want, a relative who would otherwise be authorized under State law to make such decisions, and provides the child with the option to execute a health care power of attorney, health care proxy, or other similar document recognized under State law, and is as detailed as the child may elect; and

**(I)** each child in foster care under the responsibility of the State who has attained 16 years of age receives without cost a copy of any consumer report (as defined in section 1681a(d) of Title 15 ) pertaining to the child each year until the child is discharged from care, and receives assistance (including, when feasible, from any court- appointed advocate for the child) in interpreting and resolving any inaccuracies in the report.

**(6)** The term "administrative review" means a review open to the participation of the parents of the child, conducted by a panel of appropriate persons at least one of whom is not responsible for the case management of, or the delivery of services to, either the child or the parents who are the subject of the review.

**(7)** The term "legal guardianship" means a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: protection, education, care and control of the person, custody of the person, and decisionmaking. The term "legal guardian" means the caretaker in such a relationship.

**(8)(A)** Subject to subparagraph (B), the term "child" means an individual who has not attained 18 years of age.

**(B)** At the option of a State, the term shall include an individual--

**(i)(I)** who is in foster care under the responsibility of the State;

**(II)** with respect to whom an adoption assistance agreement is in effect under section 673 of this title if the child had attained 16 years of age before the agreement became effective; or

**(III)** with respect to whom a kinship guardianship assistance agreement is in effect under section 673(d) of this title if the child had attained 16 years of age before the agreement became effective;

**(ii)** who has attained 18 years of age;

**(iii)** who has not attained 19, 20, or 21 years of age, as the State may elect; and

**(iv)** who is--

**(I)** completing secondary education or a program leading to an equivalent credential;

**(II)** enrolled in an institution which provides post-secondary or vocational education;

**(III)** participating in a program or activity designed to promote, or remove barriers to, employment;

**(IV)** employed for at least 80 hours per month; or

**(V)** incapable of doing any of the activities described in subclauses (I) through (IV) due to a medical condition, which incapability is supported by regularly updated information in the case plan of the child.